**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| PERMICO MIDSTREAM PARTNERS HOLDINGS, LLC, *et al.*, | § | Case No. 20-32437 (MI) |
| | § | (Jointly Administered) |
| Debtors[1] | § | |
| CORPAC STEEL PRODUCTS CORP., | § | |
| Plaintiff, | § | |
| Vs. | § | Adversary No. 20-03126 |
| PERMICO MIDSTREAM PARTNERS, LLC and HGC MIDSTREAM INV LLC, | § | |
| Defendants. | § | |

**PLAINTIFF CORPAC STEEL PRODUCTS CORP.'S**
**FIRST AMENDED COMPLAINT**

Plaintiff Corpac Steel Products Corp. ("Corpac") alleges as follows:

## PARTIES

1. Plaintiff Corpac is a Florida corporation with its principal place of business in Florida.

2. Defendant William R. Greendyke, Trustee, is the Chapter 11 Trustee for Permico Midstream Partners LLC ("Permico" or "the Debtor'), appointed by order of this Court entered on

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Permico Midstream Partners Holdings, LLC (6374) and Permico Midstream Partners LLC (7902). The location of the Debtors' corporate headquarters and service address is 9301 Southwest Freeway, Suite 308, Houston, TX 77074.

May 22, 2020. Permico is a Texas limited liability company with its principal place of business in Texas. Permico filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on May 4, 2020.

3. Defendant HGC Midstream INV LLC, ("HGC") on information and belief, is a Delaware limited liability company. Upon further information and belief, HGC's principal office is located at 3040 Post Oak Blvd., Suite 1000, Houston, Texas 77056.

**JURISDICTION**

4. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 541, 544 and 550, and by order of the United States District Court for the Southern District of Texas referring to this Court all cases and proceedings in this District arising in or related to a case under Title 11 of the United States Code.

5. This is a core proceeding arising under 28 U.S.C. §§ 157(b)(2)(A), (K), and (O). Corpac consents to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**RELIEF REQUESTED**

6. This adversary proceeding seeks two forms of relief. *First,* Corpac requests a determination that approximately 1,759,253 linear feet of steel pipe of various sizes, grades, specifications, and coatings and which Corpac originally agreed to sell to the Debtor – but which was never finished, paid for, or delivered – is NOT property of the Debtor's estate, and that title to such pipe in Corpac's possession remains with Corpac. *Second*, Corpac requests a determination that, because title to such pipe never passed to the Debtor, it is not subject to a security interest claimed by the Debtor's principal partner and lender, HGC.

## FACTUAL BACKGROUND

### *A. Permico agreed to purchase 1.7 million linear feet of steel pipe from Corpac to build NGL pipelines from West Texas to the Houston area via Corpus Christi.*

7. Corpac is in the business of preparing and selling pipeline materials, including line pipe.

8. Prior to the commencement of its bankruptcy case, Permico planned to build a pipeline ("the Pipeline") to transport natural gas liquids (NGLs) from the Permian, Delaware, and Eagle Ford basins in West Texas to a fractionator cite near Corpus Christi, Texas and to one or more production distribution and storage facilities near Markham, Texas and Mont Belvieu, Texas (collectively, "the Project").

9. To construct the Pipeline, Permico needed steel line pipe in various sizes, coatings, and with other specifications.

10. In or about May of 2019, Permico and Corpac agreed to three purchase orders (sometimes collectively, "the Original Purchase Orders") in which Permico agreed, in the aggregate, to purchase from Corpac approximately 1,759,253 linear feet of steel pipe of various specifications for use in constructing the Project ("the Pipe"). The purchase price for the Pipe was approximately $95,782,042.

11. One purchase order called for Corpac to supply Permico with line pipe in various sizes and grades to be custom manufactured by Mannesmann's Salzgitter unit ("Mannesmann") in Germany ("the Salzgitter Purchase Order") with various coatings and bends to be applied in the United States.

12. A second purchase order called for Corpac to supply Permico with line pipe in various sizes and grades to be custom manufactured by SeAH Steel ("SeAH") in South Korea ("the SeAH Purchase Order") with various coatings to be applied in the United States.

13. A third purchase order called for Corpac to supply Permico with line pipe of various sizes and grades not requiring additional special fabrication ("the Stock Purchase Order").

***B. Under the Original Purchase Orders' terms, title to the pipe would not pass from Corpac to Permico until Permico verified and approved the quantities and qualities of the pipe.***

14. Each of the Original Purchase Orders defined certain terms used therein, including certain key terms used in the provision defining when title to the Goods would pass to the Buyer.

15. Each of the Original Purchase Orders defined "Goods" to mean "the goods, materials, equipment, supplies, drawings, data, processes, and all other property and services including design, expediting, inspection, delivery, installation, and testing specified or required, to furnish the items in the Purchase Order[s]."

16. Each of the Original Purchase Orders defined the term "Delivery" to mean "Seller's successful delivery of the Goods to the agreed delivery location set forth in the [Original] Purchase Order[s] and acceptance of such Goods by the Buyer."

17. Each of the Original Purchase Orders specified that "[t]itle to the Goods shall pass to Buyer [i.e., Permico] upon Delivery to Buyer in accordance with this [Original] Purchase Order."

18. Each of the Original Purchase Orders provides that "[a]ll delivered quantities must be verified and approved by Buyer or Buyer's Agent and shall meet all other requirements of Delivery." Accordingly, Permico's verification and approval of the pipe – i.e., conformity to thickness, length, coating, and in some cases, bends – was required before Delivery could occur.

19. The Salzgitter Purchase Order states on its face the following additional delivery terms:

| Description (add schedule if further space required) | | | |
|---|---|---|---|
| Date of Order | Delivery Terms | Delivered Via | Delivered to Buyer at |
| May 7, 2019 | DDP Coating Yard, Houston, Texas or DDP Houston Pipe Benders (Pipe for Bends only), Houston, Texas | Loaded Trucks / Best Available – Per Quote | DDP Coating Yard, Houston, Texas or, DDP Houston Pipe Benders (Pipe for Bends only), Houston, Texas |

20. The SeAH Purchase Order states on its face the following additional delivery terms:

| Description (add schedule if further space required) | | | |
|---|---|---|---|
| Date of Order | Delivery Terms | Delivered Via | Delivered to Buyer at |
| May 7, 2019 | DDP Coating Yard, Houston, Texas | Loaded Trucks / Best Available – Per Quote | DDP Coating Yard, Houston, Texas |

21. The term "DDP" as used in the Salzgitter Purchase Order and the SeAH Purchase Order meant that Corpac would have paid any duty imposed on the imported pipe at or before the time of delivery.

22. The Stock Purchase Order states on its face the following additional delivery terms:

| Description (add schedule if further space required) | | | |
|---|---|---|---|
| Date of Order | Delivery Terms | Delivered Via | Delivered to Buyer at |
| May 7, 2019 | Items 1-6 & 12-16: FCA Coating Yard, Houston, Texas Items 7 & 10: FCA Coating Yard, Lonestar, TX; Items 8 & 11: FCA Blytheville, AR; Item 9: FCA Little Rock, AR | Loaded Trucks / Best Available – Per Quote | Items 1-6 & 12-16: FCA Coating Yard, Houston, Items 7 & 10: FCA Coating Yard, Lonestar, TX; Items 8 & 11: FCA Blytheville, AR; Item 9: FCA Little Rock, AR |

23. The term "FCA" as used in the Stock Purchase Order meant that Corpac fulfills its obligations to deliver when it placed the goods onto a carrier, i.e., the "loaded trucks" at the pipe yards described (e.g., "Coating Yard, Houston, Texas").

24. Under the terms of the Salzgitter Purchase Order, Corpac was to (i) obtain the pipe described therein from Mannesmann; (ii) import the pipe from Germany; (iii) pay or confirm payment of the United States' import duties thereon; (iv) provide in the United States the coatings and bends as provided in such purchase order; and (v) following Permico's verification of

quantities and qualities and approval by Permico, load the finished pipe on outbound trucks engaged by Permico at the pipe yards described in the Salzgitter Purchase Order.

25. Under the terms of the SeAH Purchase Order, Corpac was to (i) obtain the pipe described therein from SeAH; (ii) import the pipe from South Korea; (iii) pay or confirm payment of the import United States' duties thereon; (iv) provide in the United States the coatings as provided in such purchase order; and (v) following Permico's verification of quantities and qualities and approval by Permico, load the finished pipe on outbound trucks engaged by Permico at the pipe yards described in the SeAH Purchase Order.

26. Under the terms of the Stock Purchase Order, Corpac was to (i) obtain the pipe described therein, (ii) provide the coatings as provided in such purchase order, and (iii) following Permico's verification of quantities and qualities and approval by Permico, load the pipe on outbound trucks engaged by Permico at the pipe yards respectively described in the Stock Purchase Order.

27. Although much of the Mannesmann and SeAH pipe arrived at the respective pipe yards described in the Salzgitter Purchase Order and the SeAH Purchase Order, none of the other events to complete Delivery – as the parties defined that term – occurred. Particularly, none of the Mannesmann pipe to be bent was ever bent – such that it became "Goods" as defined in the Original Purchase Orders. While most of the Salzgitter and SeAH pipe has been coated, it was not coated all at once. Indeed, it was coated in small units over many months. Neither Permico, nor Permico's agent, ever verified or approved any quantity or the qualities of any of pipe Corpac obtained from Mannesman or SeAH or any of the stock pipe described in the Stock Purchase Order. None of the Mannesmann pipe, SeAH pipe or Stock Order pipe was ever loaded on trucks engaged by Permico as provided in the Original Purchase Orders. Accordingly, Permico never

accepted any of the pipe, Delivery never occurred, and Permico and has no rights in such Pipe.

28. Before any of the events to complete Delivery and acceptance of the Pipe occurred, Permico repudiated the Original Purchase Orders when it informed Corpac in June of 2019 that Permico could not pay for or take delivery of any of the Pipe in accordance with the terms of the Original Purchase Orders. Indeed, from June of 2019 forward, Permico requested that Corpac delay delivery of the Pipe as it was not able to pay for it, and Permico agreed to delay deliveries, verifications, and inspections, and never accepted any of the pipe.

### C. *Womble Company, Tenaris, A&A Coating, and other pipe yards warehoused the pipe which Corpac was accumulating to meet Corpac's obligations to Permico. Other pipe yards fulfilled a similar role for Corpac.*

29. Corpac, like many sellers of oilfield and line pipe, routinely warehouses its existing inventory of pipe held for sale at third-party yards. Similarly, Corpac, like many other sellers, routinely warehouses pipe accumulated for specific orders at such third-party yards. Many of these pipe yards also provide services such as application of various coatings. Womble Company, Inc. in Houston Texas is one such company providing warehousing and coating services to pipe sellers like Corpac. Others include the following: (i) A&A Coating in Lonestar, Texas ("A&A") (ii) Tenaris in Blytheville, Arkansas ("Tenaris"), and (iii) Welspun Tubular in Little Rock, Arkansas ("Welspun") (such pipe yards collectively, with Womble, are sometimes referred to herein as "the Pipe Yards" and individually as "pipe yard").

30. At all times relevant to this adversary proceeding, Corpac has been a customer of the Pipe Yards. For a substantial period predating the Permico contracts, each of the Pipe Yards has routinely warehoused some of Corpac's line pipe inventory held for sale.

31. The Pipe Yards routinely segregate each customer's (e.g., Corpac's) pipe. Their customary practice is to, individually bar code or otherwise apply identification marking on it, and

record it on their books and records as the customer's (e.g., Corpac's) property. The Pipe Yards routinely store a customer's pipe identified on the respective Pipe Yard's books and records as such customer's. The Pipe Yards routinely issue warehouse receipts or other documentation for the pipe each stores, including so-called "Receiving Reports," to customers such as Corpac.

32. When a customer of an individual pipe yard acquires pipe from another customer of that pipe yard, the routine practice of the pipe yard's customers is for the selling-customer to notify the pipe yard of the sale. The routine practice of each of the Pipe Yards is to then enter the transfer of ownership of the pipe from the selling customer to the purchasing customer. This routine practice includes having the warehouse receipts from a pipe yard's selling customer surrendered to the pipe yard and new receiving receipts or warehouse receipts being issued by the pipe yard to the purchasing customer. As alleged below, Permico was never a customer of any of the Pipe Yards, much less a buying-customer of the Pipe Yards.

33. Pipe Yards typically do not have or maintain records identifying why one of its customers buys or stores items of pipe at their facilities. Accordingly, without identification by Corpac provided to one of the Pipe Yards, the Pipe Yards are not able to identify specific Corpac items on the Corpac Racks to fill any particular Corpac-customer's order.

34. With respect to those of the Pipe Yards which provide coating and finishing services, their routine practice with respect to Corpac is to release finished goods only after receiving a request to do so from Corpac. Typically, in the ordinary course of business, Corpac may request that pipe be delivered to the buyer by arranging for the pipe yard to load the pipe on the buyer's trucks.

35. With respect to most of the Pipe at issue in this case, the Pipe Yards stored the pipe material that Corpac was accumulating in order to fill Permico's orders on racks dedicated to

Corpac, some of which were referred to as "Corpac's Racks." Since Pipe Yards identified the pipe material received from or for the account of Corpac as Corpac's in such pipe yard's records, such pipe yards issued warehouse receipts or other documents for those materials it stored for Corpac, including so-called "Receiving Reports."

36. After the Original Purchase Orders were agreed to between Corpac and Permico, Corpac took steps to identify existing pipe in its inventory to fill portions of the Original Purchase Orders and to acquire other pipe to fill the Original Purchase Orders. Some of the unfinished line pipe needed to fulfill the Original Purchase Orders was already among pipe Corpac stored at one or more of the Pipe Yards. Some of this "stock" inventory required additional coating to meet the requirements of the Original Purchase Orders and constitute finished "Goods" under the Original Purchase Orders.

37. Other line pipe for the Original Purchase Orders had to be entirely and specially fabricated or procured by Corpac from third-party vendors, then shipped to Womble for storage on the Corpac Racks and coating, some with bending, all of which would have been followed by inspection, barcoding or other form of identification marking, and processing by Womble or a pipe bender to convert the raw line pipe into finished product prior to Permico's verification of quantities and conformity to specifications set for in the purchase orders.

38. And other line pipe that did not require special fabrication had to be identified and accumulated at various other pipe yards which were located in (1) Houston, Texas, (2) Lonestar, Texas, (3) Blytheville, Arkansas, and (4) Little Rock Arkansas.

39. At all times relevant to the events in this adversary proceeding, the Pipe Yards acted as Corpac's bailees with respect to the portions of the Pipe the Pipe Yard they received or which had been delivered to Corpac by its supplier (the "Stored Pipe"). Consistent with their routine, the

Pipe Yards did not permit any other party (including Permico) to access, move, transport, or otherwise control the Stored Pipe or any portion of it. The Pipe Yards also did not permit Permico to inspect the Stored Pipe or any portion of it. Indeed, as set forth below, Permico never requested to inspect any of the Stored Pipe (or pipe material) so as to "verif[y] or approve[ ]" as the Purchase Orders provided.

40. All of the Stored Pipe or pipe material to be used for the Permico order delivered to and accepted by Corpac that was stored at a Pipe Yard was barcoded or otherwise marked for identification by the pipe yard and recorded on the pipe yard's books and records as being owned by Corpac. To this day and at every point since any portions of the Stored Pipe arrived at the Pipe Yards, such pipe yard's books and records have reflected that those portions are and have been owned by Corpac. Consistent with their routine practice, each pipe yard has followed and, going forward, will only follow the express instructions of Corpac with respect to the movement, treatment, disposition, or release of any portions of the Stored Pipe.

41. Each of the Pipe Yards provide records to Corpac showing that the portions of the Stored Pipe and pipe material in its warehouse/yard was being held on as Corpac's pipe.

**D. *In June of 2019 Permico repudiated the Original Purchase Orders, claiming it had no funds to pay Corpac for the Pipe and sought extensions of time to pay and for Delivery to take place.***

42. As alleged above, in June of 2019, Permico notified Corpac of the following: (1) Permico lacked the ability to pay for the Pipe on the timeline contemplated by the Original Purchase Orders because of delays in obtaining construction financing, and (2) Permico would not take delivery of the Pipe when scheduled.

43. As a result of its financing problems, Permico requested that Corpac agree to delay delivery of the Pipe and delay Permico's obligation to pay for the Pipe. At no time prior to, or

after, the foregoing notice and request from Permico was any of the Pipe delivered to or accepted by Permico. By notifying Corpac that Permico would not be able to pay for any of the Pipe, Permico anticipatorily repudiated its obligations under the Original Purchase Orders.

44. At no time did Permico request access to any of the Stored Pipe in order to verify or approve any quantities or qualities of the Stored Pipe. At no time did Corpac authorize, and at no time did the Pipe Yards record on its books, any transfer of ownership of any portion of the Stored Pipe to Permico.

45. Permico is not and has never been a customer of the Pipe Yards, nor has Permico had any direct business relationship with the Pipe Yards. At no time did any of the Pipe Yards take possession of any property on behalf of Permico. None of the Pipe Yards has ever been under any obligation, contractual or otherwise, to perform any services for Permico, and none of the Pipe Yards have exercised dominion or control over any property on behalf of or for the benefit of Permico.

46. Due to Permico's repudiation of the Original Purchase Orders, Corpac initially instructed the Pipe Yards to cease any coating services on the Stored Pipe. Later, so as to prevent the Stored Pipe from corroding or "pitting" due to exposure to the open air, and to maintain the Stored Pipe's integrity, Pipe Yards were periodically asked to continue with some coating services.

47. In addition, some of the line pipe material needed to complete the Pipe was never received from Corpac's suppliers.

48. Due to Permico's repudiation of the Original Purchase Orders, the portions of the Stored Pipe intended for bending were never sent to Houston Pipe Benders, as specified in the Salzgitter Purchase Order.

49. Due to Permico's repudiation of the Original Purchase Orders, none of Corpac, the

Pipe Yards, or Permico, ever made any arrangements for Permico to take physical possession of any of the portion of the Stored Pipe "via loaded trucks," as provided in the Original Purchase Orders, or by any other method. Neither Permico, nor anyone acting on its behalf, ever supplied any such trucks for loading, and none of the Stored Pipe was ever loaded onto any trucks to transport it from the Pipe Yards to Permico's ultimate destination.

50. Permico never paid Corpac any portion of the approximately $95,782,042 purchase price that it had agreed to pay on account of the Original Purchase Orders.

51. Meanwhile, at all relevant times the Pipe Yards held portions of Stored Pipe and pipe material in its possession solely on behalf of Corpac. Accordingly, none of the Stored Pipe was ever delivered to Permico, title never passed to Permico, and the unfinished pipe material still sits among Corpac's other unrelated pipe in the Corpac Racks at the Pipe Yards.

***E. Following Permico's repudiation of the Original Purchase Orders, Corpac and Permico agree to amend the Original Purchase Orders to allow Permico more time to perform and to delay Delivery.***

52. Permico and Corpac have twice amended the Original Purchase Orders to reflect the changed circumstances in light of Permico's inability to pay.

53. In November of 2019, Permico and Corpac agreed to the first amendment to the Original Purchase Orders ("Amendment No. 1"). For sake of clarity, the Original Purchase Orders as amended by Amendment No. 1 are referred to as the First Amended Purchase Orders.

54. In March of 2020, Permico and Corpac agreed to amend the First Amended Purchase Orders ("Amendment No. 2"). For the sake of clarity, the First Amended Purchase Orders as amended by Amendment No. 2 are referred to as the Second Amended Purchase Orders.

55. The recital in Amendment No. 1 and Amendment No. 2 explained that, "due to delays in the project financing for [Permico's] Companero [sic] and Simpatico NGL Pipeline Project (the 'Project'), [Permico] has been unable to make payments due under the [Original]

Purchase Order consistent with the terms of the [Original] Purchase Order." As a result of these delays, the recitals in Amendment No. 1 explained that "the Parties have negotiated and agreed upon amended payment terms with respect to the [Original] Purchase Order[s]."

56. Amendment No. 2's recitals also acknowledged that, "[Permico] has breached the [Original] Purchase Order[s] and requested that [Corpac] delay delivery of the Goods and delay payments require from [Permico] under the [Original] Purchase Orders until such time as [Permico] has obtained the necessary financing."

57. Amendment No. 2's recitals acknowledged that "since arrival of the Goods at the premises of [Corpac's] bailee [e.g., Womble], [Permico] has never performed a review, inspected, counted or otherwise accepted the Goods."

58. Amendment No. 2's recitals stated that "the Goods have not been delivered to [Permico] and possession of and title to the Goods and risk of loss have at all times remained with [Corpac]."

59. Amendment No. 2's recitals explained that "[Corpac] has incurred and continued to incur substantial carrying costs related to the Goods and suffered other damages due to [Permico's] breach of the Purchase Order; and … the Parties have negotiated and agreed upon amended payment terms with respect to the Purchase Order as set forth in this Amendment to allow [Corpac] to mitigate its damages caused by [Permico's] breach of the Purchase Order and to enable [Corpac] to be compensated for its damage including, without limitation, its increased carrying costs for the Goods."

60. In order to cover Corpac's storage and maintenance costs caused by Permico's financing delays and repudiation of the Original Purchase Orders, Permico agreed in Amendment No. 1 to pay Corpac additional interest on its delayed payments. In particular, Amendment No. 1

provided that "[Permico] shall owe additional interest on such unpaid amounts of the Purchase Order[s] at the rate of seven and one-half percent (7.5%) per annum (i.e., 0.625% per month)" and that "[s]uch interest rate shall increase to the rate of twelve percent (12%) per annum (i.e., 1% per month) beginning on April 1, 2020." Permico was to make these payments "no later than the fifteenth (15th) day of the month following the month in which such Interest Payments accrued."

61. Amendment No. 1 also provided that Corpac could charge Permico a minimum fee of 20% of the full amounts of the price set forth in Purchase Orders as its "minimum indemnification for any Resale Losses (as defined below) [Corpac] may incur in reselling the Goods to third parties."

62. Amendment No. 1 set a "Termination Date" of June 30, 2020, providing that if Permico did not make payment in full by that date, Corpac would have "the right, but not the obligation, to immediately terminate the Purchase Order[s] by issuing written notice to [Permico]."

63. Amendment No. 1 and Amendment No. 2 amended other terms of the Original Purchase Orders regarding "Title and Risk of Loss." Amendment No. 1 amended Section 16 of the Original Purchase Orders to provide that title would pass "upon Delivery to Buyer" in part as follows:

> Title to the Goods shall pass to Buyer upon payment made by Buyer to Seller for such Goods in accordance with the Purchase Order. For the avoidance of doubt, title to the Goods shall transfer to Buyer in proportion to the payments made therefor by Buyer to Seller (i.e., on a 'pro-rata' basis). Notwithstanding the Delivery or location of the Goods, title to any Goods Delivered under the Purchase Order remains with the Seller until payment for such Goods is made by Buyer to Seller in full in accordance with the Purchase Order.

64. Amendment No. 2 further amended Section 16 of the Purchase Orders regarding "Title and Risk of Loss" and to add the following language in lieu of the original first two sentences of Section 16:

> Title to any particular Goods shall not pass to Buyer until (i) full cash payment made by Buyer to Seller for such Goods and (ii) Seller's delivery of such Goods to Buyer. Title to any such Goods under the Purchase Order remains with the Seller until both conditions (i) and (ii) above are met. All Prices set forth in the Purchase Order remain firm and shall not be modified except by Change Order executed by each of the Parties. Delivery of any particular Goods shall not occur until after payment for same.

65. Regarding the schedule for delivery, Amendment No. 2 provided that (1) "the Delivery Dates for the Goods prior to the Initial Payment Date are hereby waived by the Buyer and no Delay Liquidated Damages shall apply to delivery of such Goods." Amendment No. 2 provided that "the delay in financing by the Buyer is a Buyer-Caused Delay under Section 11 of the Purchase Order[s] and the delivery of Goods is hereby suspended until the Initial Payment Date, whereupon at such time the Parties shall revise the Delivery Schedule for the remaining Goods under the Purchase Order[s] pursuant to a mutually agreed Change Order as required under the terms of this Purchase Order[s]."

66. Amendment No. 2 also provided that "the provisions of [Amendment No. 1] (as amended [by Amendment No. 2) are a full and final settlement and accord and satisfaction of all financial effects of the delay in financing or breach by the Buyer as of the Effective Date and that the provisions of the Amendment (as amended) fully compensate Seller fully [sic] for its damages through the Effective Date for such circumstances."

***F. Out of nowhere, HGC claimed to have a UCC security interest in the Pipe.***

67. Although Permico never paid Corpac for the Pipe, the Pipe was never delivered to Permico under the terms of the contracts between Permico and Corpac, and title to the Pipe never passed to Permico, HGC claimed to have a UCC security interest in the Pipe.

68. On January 27, 2020, HGC wrote a letter to Corpac and Permico claiming it held a security interest in the Pipe pursuant to a security agreement it claimed to have with Permico purportedly granting HGC a UCC security interest in "all of Permico's right, title, and interest in…

all [of Permico's] goods and equipment, whether existing as of the date of the Security Agreement or thereafter arising or acquired."

**COUNT ONE**

**(Declaratory Judgment)**

69. Corpac realleges and incorporates herein by reference each and every allegation and paragraph set forth previously.

70. Pursuant to the 28 U.S.C. §§ 157, 2201 and 2202, Court should determine and declare that title to the Pipe (including the Stored Pipe) did not pass to the Debtor, that the Stored Pipe remains Corpac's property, and that none of the Pipe is property of the Debtor's estate under Section 541 of the Bankruptcy Code.

**COUNT TWO**

**(Determination of Validity, Extent and Priority of HGC's Lien and Declaratory Judgment)**

71. Corpac realleges and incorporates herein by reference each and every allegation and paragraph set forth previously.

72. Pursuant to 28 U.S.C. §§ 157, 2201, and 2202, the Court should determine and declare that HGC has no security interest in any of the Pipe.

**PRAYER FOR RELIEF**

Corpac respectfully requests that this Court do the following:

1. Issue a declaratory judgment and determination that title to the Pipe did not pass to the Debtor, that the Stored Pipe remains Corpac's property, and that none of the Pipe is property of the Debtor's estate under Section 541 of the Bankruptcy Code.

2. Issue a declaratory judgment and determination that HGC has no security interest in any of the Pipe.

3. Grant Corpac such other and further relief to which it is entitled, including judgment for costs.

Dated: March 19, 2021.

Respectfully submitted,

*/s/ Joseph S. Cohen*

ROSENTHAL LAW FIRM, P.L.L.C.
Trent L. Rosenthal
Texas Bar No. 17282300
trosenthal@rosenthallaw.com
Joseph S. Cohen
Texas Bar No. 04508370
jcohen@rosenthallaw.com
675 Bering Drive, Suite 150
Houston, Texas 77057
Tel: (713) 647-8177
Fax: (713) 647-8127

REESE MARKETOS LLP
Pete Marketos
Texas Bar No. 24013101
Pete.marketos@rm-firm.com
Brett S. Rosenthal
Texas Bar No. 24080096
Brett.Rosenthal@rm-firm.com
750 N. Saint Paul Street, Suite 600
Dallas, Texas 75243
Tel: (214) 382-9810
Fax: (214) 501-0731

***ATTORNEYS FOR PLAINTIFF CORPAC STEEL PRODUCTS CORP.***

**Certificate of Service**

I hereby certify that a copy of this First Amended Complaint is being served upon all counsel of record through the Court's electronic case filing service upon its being filed with the Court.

*/s/ Joseph S. Cohen*________________
Joseph S. Cohen